**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANGELICA CAPITAL TRUST,<br><br>       Petitioner,<br><br>-against-<br><br>ADDICTION RECOVERY CARE LLC, TIM ROBINSON, and LELIA ROBINSON,<br><br>       Respondents. | 26-civ.-241<br><br>**PETITION FOR A TEMPORARY RESTRAINING ORDER AND INJUNCTION IN AID OF ARBITRATION** |

Angelica Capital Trust ("Angelica" or "Petitioner"), by and through its attorneys, Clifford Chance US, LLP, for its Petition alleges as follows:

**PRELIMINARY STATEMENT**

1. This is an action to prevent Respondents from misappropriating Angelica's property — including by using it to pay operational expenses to stave off an imminent bankruptcy Respondents have threatened — pending an expedited AAA arbitration that Petitioner has filed to enforce its clear contractual rights.

2. The action arises out of Angelica's purchase of more than $8 million of tax receivables from Addiction Recovery Care LLC ("ARC"). Angelica paid ARC for the receivables, but after the IRS delivered the checks to ARC, ARC kept the money.

3. ARC is wrongfully holding on to this money because it is in desperate straits. The U.S. Department of Justice ("DOJ") is pursuing claims against ARC for Medicaid and Medicare fraud, and to settle those claims ARC needs $27.7 million. ARC has held off the DOJ by saying it can raise the money to pay for that settlement by selling assets and entities. ARC originally sold the tax receivables to Angelica to make a sales transaction more attractive to a potential buyer — Ethema Health Corporation — which had entered into a non-binding letter of intent with ARC. But after that deal fell through, ARC told Angelica it was keeping the tax receivables until it was able to close a deal with another buyer. ARC did

not dispute that it was breaching its contracts with Angelica; ARC just needed the money to get a deal done and to survive.  ARC said that its bank account had little else and it faced operational expenses.  ARC threatened that if it was not able to close a new deal, it would declare bankruptcy.

4.      As set forth herein, absent a temporary restraining order and injunctive relief preventing ARC from wrongfully dissipating Angelica's property, there is a substantial risk that any arbitration award will be rendered ineffectual and Angelica will suffer irreparable harm because ARC will have used Angelica's money and gone bankrupt.

5.      Accordingly, Petitioner seeks an order pursuant to Rule 65 of the Federal Rules of Civil Procedure and N.Y. CPLR 7502(c) for a temporary restraining order and injunction to enjoin Respondents during the pendency of the Arbitration and any confirmation and enforcement proceedings from: (i) transferring, causing to be transferred, or taking any action to transfer any funds out of the ARC bank account holding Angelica's property; and (ii) transferring, causing to be transferred, or taking any action to transfer any assets or entities owned by ARC to any third party in any manner that would leave ARC with less than $10 million in liquid assets, such being a reasonable estimate of ARC's liability to Angelica.

## PARTIES

6.      Petitioner Angelica Capital Trust is a trust organized under the laws of Delaware.  The trustee of Angelica is CSC Delaware Trust Company, a Delaware company.  The sole beneficiary of Angelica is Score Capital High Yield Fund I Ltd, a Bahamian company.  As is relevant here, Angelica is in the business of purchasing tax credit receivables, among other investment activities.

7.      On information and belief, Respondent Addiction Recovery Care LLC is a Kentucky limited liability company, headquartered in Louisa, Kentucky.  ARC operates residential and outpatient drug rehabilitation facilities in Kentucky and offers behavioral healthcare and medical healthcare services to patients.  On information and belief, the sole members of ARC are Respondents Tim Robinson and Lelia Robinson, each of whom is a citizen of the Commonwealth of Kentucky and resides in Kentucky.

- 3 -

8. On information and belief, Respondent Tim Robinson is the founder of ARC and a member of the limited liability company. On information and belief, Mr. Robinson is a citizen of the Commonwealth of Kentucky and resides in Kentucky.

9. On information and belief, Respondent Lelia Robinson is married to Respondent Tim Robinson and a member of ARC. On information and belief, Ms. Robinson is a citizen of the Commonwealth of Kentucky and resides in Kentucky.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that this is a civil action between citizens of a State and subjects of a foreign state, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

11. Venue is proper in this judicial district under 28 U.S.C. § 1391 because the Arbitration that is the subject of this action is seated in this District. Venue is proper in this judicial district also because the arbitration agreement in the Agreements (as defined herein) specifies the "Designated Venue" as Manhattan, New York and expressly provides that (i) the parties to the Agreements "submit to the exclusive jurisdiction of the Designated Venue, including the *in personam* jurisdiction of the Designated Venue, waive any objection to such jurisdiction on the grounds of venue or *forum non conveniens* or the absence of *in personam* jurisdiction and any similar grounds"; and (ii) the arbitration agreement "shall not preclude a party from seeking provisional remedies in aid of arbitration or equitable relief from a court in the Designated Venue."

**FACTS**

**I.     ARC Engages in Medicaid Fraud and Negotiates a Settlement with the U.S. Department of Justice.**

12.     This action ultimately arises out of ARC's fitful attempts to deal with the consequences of a massive fraud that ARC perpetrated over a number of years.  Specifically, ARC submitted, or caused to be submitted, millions of dollars in false claims for payment to the Medicaid Program in Kentucky, including its Managed Care Organizations, *see* 42 U.S.C. §§ 1396-1396w5, and to the Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395lll.

13.     On April 25, 2023, certain relators filed a *qui tam* action in the United States District Court for the Eastern District of Kentucky captioned *United States ex rel. Relators v. Addiction Recovery Care, LLC* (23-CV-0051) alleging various violations of the False Claims Act, 31 U.S.C. §§ 3729-3733 by ARC and its affiliates.  This led to an investigation by the U.S. Department of Justice, which uncovered even more fraud.

14.     Under the pressure of these actions, ARC attempted to negotiate a resolution with the DOJ.  By late 2025, ARC had negotiated a draft settlement agreement with the DOJ.  The draft settlement agreement required ARC and its affiliates to pay approximately ***$27.7 million*** respecting overpayments to ARC and damages.  But it also critically allowed ARC to remain an eligible Medicaid and Medicare provider, which was essential to ARC's business.

15.     ARC, however, needed to raise large amounts of cash to pay these settlement amounts and get out from under the intense pressure that ARC was facing from the DOJ.  ARC told the DOJ that it intended to fund the settlement with proceeds from a phased sale of certain ARC assets and entities to Ethema Health Corporation ("Ethema"), pursuant to a Letter of Intent that ARC had executed with Ethema on or about October 20, 2025 (the "Ethema Letter of Intent").  ARC contemplated that early closings with

respect to some of the sold assets or entities would fund ARC's ongoing operations; later closings would fund the DOJ settlement.

16.  The Ethema Letter of Intent, however, did not bind either party to purchase or sell the ARC assets and entities under consideration. ARC planned to hold off executing any settlement agreement with the DOJ until after it finalized a deal with Ethema.

**II.   ARC Sells Certain Tax Receivables to Angelica Pursuant to the Agreements.**

17.  In or around November 2025, ARC approached Angelica proposing to sell to Angelica two certain Employee Retention Credit tax payments that ARC expected to receive from the Internal Revenue Service ("IRS") by the beginning of December 2025 (the "Purchased Tax Receivables"). The Purchased Tax Receivables totaled $6,908,472.91 plus potential additional interest payments owing from the IRS. ARC told Angelica that ARC needed to get cash quickly to enhance ARC's position in its dealings with Ethema.

18.  On November 12, 2025, Angelica and ARC executed two substantially similar agreements for the sale and purchase of ARC's two ERC tax receivables. Copies of those agreements are attached hereto as Exhibits 1 and 2 (the "Agreements").

19.  Pursuant to the Agreements, Angelica agreed to pay ARC in three parts: (i) a "Seller Initial Disbursement" totaling $4,739,843.18 to be paid to ARC within 10 days; (ii) a "Preparer Disbursement" totaling $717,850.42 to be paid to ARC's tax preparer within 10 days; and (iii) a "Retainage Amount" totaling $690,847.27 plus 15% of any "Adjustment Amount" (*e.g.*, any additional interest paid by the IRS on the Purchased Tax Receivables), to be paid to ARC ***only after*** Angelica's receipt of the Purchased Tax Receivables. (*See* Agreements, Section 3.)

20.  For its part, ARC transferred to Angelica all rights and title to the Purchased Tax Receivables. Section 4 of the Agreements provided that:

> By and upon execution of this Contract, Seller hereby sells, assigns, and transfers the Purchased Receivable to Buyer in consideration of Buyer paying the Purchase Price in accordance with the terms set forth [in the Agreements].

Similarly, Section 6 expressly stated:

> It is the intention of the parties that payment of the Purchase Price to Seller shall constitute an absolute purchase and sale of the Purchased Receivable to Buyer and not a loan; and, it is the intention of the parties that the transactions contemplated herein constitute a purchase and sale of a receivable owed to Seller for U.S. federal and applicable state and local tax purposes. Seller shall not have any right, title or interest in any Purchased Receivable and shall not make any claims with respect to any collections or payments on such Purchased Receivable.

21. As a belts and suspenders, the Agreements also granted Angelica a first priority perfected security interest in all of ARC's "right, title and interest in, to and under **all** assets of [ARC] and its Affiliates . . . ." defined in the Agreements as the "Security." (Agreements, Section 6 (emphasis added).)

22. The Agreements also contained detailed provisions requiring ARC (i) immediately to notify Angelica if ARC directly received the Purchased Receivables (Agreements, Sections 4.1.1. & 4.1.2.); and (ii) within one business day, either make the IRS checks available to Angelica for collection or — at Angelica's "direction and sole discretion" — send the checks to Angelica. (Agreements, Sections 4.1.3. & 4.1.4.) More generally, ARC agreed "to fully cooperate with [Angelica] in all respects concerning the Purchased Receivable and [Angelica's] collection of the proceeds thereof from the IRS." (Agreements, Section 4.7.)

23. The Agreements also expressly provided that ARC was to "refrain from retaining, using, cashing, depositing, endorsing or otherwise benefiting in any way, directly or indirectly, from any portion of the Purchased Receivable received." (Agreements, Section 4.1.5.) Likewise, ARC agreed "not to take any action that may impede, divert or interfere with Buyer's right to payment and collection of Purchased Receivable." (Agreements, Section 8.9.)

24. In the event that ARC defaulted on its obligations to transmit the Purchased Tax Receivables to Angelica, the Agreements required ARC "to account for, segregate, make available and deliver to Buyer, its agents or representatives, the Security [*i.e.*, any of ARC's property], at any place and time designated by Buyer." (Agreements, Section 12.3.1)  In addition, the Agreements give Angelica rights to exercise rights over ARC's property, including:

> 12.3.2. take possession of, operate, remove from any location, collect, transfer and receive, recover, appropriate, foreclose, extend payment of, adjust, compromise, settle, release any claims included in, and do all other acts or things necessary or that Buyer in its sole discretion deems appropriate, to protect, maintain, preserve and realize upon, the Security and any proceeds thereof, in whole or in part; and
>
> 12.3.3. exercise all rights, powers and interests with respect to any and all Security, and sell, assign, lease, license, pledge, transfer, negotiate (including endorse checks, drafts, orders or instruments), deliver or otherwise dispose of the Security or any part thereof. . . . ***In the event Buyer institutes an action to recover any Security or seeks any prejudgment remedy, Seller waives the posting of any bond which might otherwise be required by law***. . . . .

(Agreements, Sections 12.3.2 & 12.3.3. (emphasis added).)

25. The Agreements also provided that if ARC defaulted on its payment obligations that ARC would owe Angelica default interest of 18% per annum accruing from the event of default until all amounts due to Angelica are paid in full. (Agreements, Section 12.7.)  In addition, the Agreements entitle Angelica to recover from ARC Angelica's costs of collection, including, but not limited to, its reasonable attorneys' fees. (*See* Agreements, Section 12.6.)

26. Respondents Mr. Tim Robinson and Ms. Lelia Robinson (the "Personal Guarantors") each personally guaranteed full and timely performance of ARC under the Agreements and, in the event of a payment default by ARC, agreed to be liable for liquidated damages equal to 150% of the face amount of any Refund Check received by ARC from the IRS respecting the Purchased Tax Receivables, together

with all costs of collection, including reasonable attorneys' fees. (*See* Agreements, Section 28.) The Personal Guarantors' obligations are several and independent of ARC's obligations. (*Id.*)

### III. Angelica Performs Its Obligations under the Agreements.

27. After the Parties executed the Agreements, Angelica performed its end of the deal. Angelica paid (i) ARC the "Seller Initial Disbursement" totaling $4,739,843.18; and (ii) ARC's tax preparer the "Preparer Disbursement" totaling $717,850.42. On November 13, 2025, on behalf of ARC, Mr. Robinson confirmed payment to Angelica's service agent (a company called Intero Capital): "Wire is in our account."

28. On November 13, 2025, Angelica filed a UCC Lien in the Office of the Kentucky Secretary of State to perfect Angelica's property and security interest in the Purchased Tax Receivables and security interest in ARC's other assets.

### IV. ARC Receives the Purchased Tax Receivables from the IRS and Defaults on the Agreements.

29. On December 2, 2025, Mr. Robinson advised Angelica that ARC had received refund checks respecting the Purchased Tax Receivables, in amounts totaling $8,146,277.11, reflecting the amounts of the receivables plus interest paid by the IRS (the "Refund Checks"). Mr. Robinson asked for direction from Angelica's service agent on how to proceed. The same day, Angelica instructed ARC to deposit the Refund Checks in ARC's company bank account at Community Trust Bank and initiate a wire transfer for the total deposit amount, *i.e.*, $8,146,277.11, to Angelica's bank account at M&T Bank. Angelica's service agent also confirmed that, as provided in the Agreements, Angelica would pay $876,517.92 to ARC respecting the Retainage Amounts and 15% of the Adjustment Amounts (for the interest paid by the IRS on the Purchased Tax Receivables) after it received ARC's wire.

30. Mr. Robinson confirmed by email to Angelica's service agent that "[w]e acknowledge your instructions and will follow them sending you confirmation." He asked that Angelica's service agent confirm that Angelica would be wiring back any funds owed to ARC on the same day. In response,

Angelica's service agent confirmed that any funds owed respecting the Retainage Amounts and the Adjustment Amounts would be wired in a same day transaction. Mr. Robinson responded "We will get checks deposited today and when they are shown as available wire them and send you confirmation."

31. On December 3, 2025, Mr. Robinson advised Angelica's service agent that ARC's bank had placed a hold on the deposit until December 12, 2025 and requested that ARC be permitted to remit payment after the hold had been lifted. Angelica agreed to this accommodation, relying on Mr. Robinson's representation that ARC would wire the owed funds promptly after the hold was lifted.

32. On December 10, 2025, Mr. Robinson sent a screenshot of ARC's bank balance at Community Trust Bank (as of December 10, 2025 at 11:55:11 am Eastern Time) to show that the funds respecting the Purchased Tax Receivables were deposited. The screenshot showed an ARC balance of $8,239,268.11, but with an accessible balance of only $99,716. ***Accordingly, almost the entirety of ARC's bank account balance represented the held deposit of Angelica's Purchased Tax Receivable***.

33. On December 12, 2025, the bank hold was lifted on the funds and Angelica's servicer asked for confirmation that ARC was wiring the funds. ARC did not wire funds. Instead, ARC requested that the Agreements be amended formally to reflect the payment mechanics, supposedly because the Agreements did not explicitly mention the possibility that ARC would deposit and then remit the IRS checks. No amendment was necessary because the Agreements contained general provisions that ARC was to follow Angelica's directions respecting any Refund Checks (*see supra* Paragraph 22) and the Parties already had agreed on how to proceed.

34. On December 15, 2025, Angelica's servicer indicated that Angelica was amenable to working to resolve any legal amendments but stated clearly that this accommodation was not to delay any payment. Specifically, Angelica's servicer stated "Please note that there is the absolute expectation that a proof of payment will be received this morning confirming funds have been sent to the account details

below, and as previously provided . . . We will work to resolve the legal amendments with your counsel, but under no circumstances can this impact settlement today." ARC did not wire funds.

**V.     ARC Refuses to Turn Over the Purchased Tax Receivables to Angelica and Threatens Bankruptcy.**

35.     ARC's request to document amendments appears to have been a deceptive ploy to stall for time.

36.     Later in the day on December 15, 2025, ARC's in-house counsel, Jessica Burke, emailed Angelica's service agent "I am reviewing this matter. My schedule is currently open anytime after 9:30 tomorrow to discuss. Can you please connect me with your counsel?"

37.     The next day (December 16, 2025), Ms. Burke told Angelica's service agent that ARC's deal with Ethema had fallen through because Ethema had "some issues" with their "capital stack." Ms. Burke told that ARC had a letter of intent with a new buyer, who supposedly wanted any payments to Angelica to be made out of the transaction proceeds. Ms. Burke indicated that ARC expected this supposed new deal to close in two weeks, *i.e.*, by December 31, 2025, and asked that Angelica agree to be paid in connection with the closing. Angelica's service agent rejected this proposal and demanded that ARC make immediate payment to Angelica.

38.     Later that day, Ms. Burke emailed Angelica's service agent: "I have discussed this matter further with the relevant principles [sic]. ***I am unable to agree to any immediate action.*** Please connect me with counsel for Angelica Capital Trust at your earliest convenience." (Emphasis added.) She added ominously that she considered that it was "in the best interest of both parties" that Angelica agree to be paid after ARC's supposed transaction with its purported "new buyer" closed.

39.     The next morning, Angelica's service agent again rejected this proposal and told ARC that ARC was in default and must make immediate payment:

> ***Angelica's position is that ARC's ERC sale and purchase contracts are in default***, ARC is holding assets that belong to Angelica, that Angelica has

> no part in ARC's M&A activities (neither does Angelica have any knowledge or understanding of who ARC's buyer is, their intentions, and the strength of their balance sheet, etc.) and, therefore, that full and final settlement of Angelica's ERC transactions must be achieved by ARC by bank wire, by close of business today (Weds 17th Dec)

Later that day, Angelica's service agent reiterated that "Angelica Capital Trust is expecting full and final return of their funds related to the ERC transactions today."

40. On Thursday, December 18, 2025, outside counsel for Angelica wrote to Ms. Burke stating that ARC had breached the Agreements, reiterating that Angelica rejected any proposals to delay payment, and demanding immediate payment.

41. In the afternoon, on Friday December 19, 2025, Ms. Burke emailed back "I am confirming receipt. I will discuss with my client and have a response to you on Monday." On Monday, December 22, 2025, Ms. Burke emailed that she had availability to have a discussion that afternoon or the next day. Outside counsel responded that he was available that afternoon and provided a number to call. Ms. Burke did not call.

42. That evening, outside counsel for Angelica called Ms. Burke and left a voicemail indicating that he was available for a call. Ms. Burke did not respond. The next day outside counsel for Angelica called Ms. Burke again. Ms. Burke did not respond. The day after, outside counsel for Angelica emailed Ms. Burke. Ms. Burke did not respond.

43. Finally, on December 30, 2025, Ms. Burke surfaced with a letter. Ms. Burke said that ARC's purported deal with some transaction partner was now expected to close a month later, *i.e.*, by January 31, 2026. She also threatened that ARC would declare bankruptcy if Angelica did not facilitate ARC's transaction negotiations by acceding to ARC continuing to misappropriate Angelica's funds. Specifically, she stated in relevant part:

> As you may know, ARC finds itself in a difficult position. Multiple changes in the industry and company specific challenges over the past eighteen months have led to ***ARC being in a precarious position***.

> ***In order to ensure the ongoing viability of ARC***, external partners were sought. After vetting several potential opportunities, ARC is now within thirty (30) days of closing on an agreement for another entity to acquire the company. . . .
>
> While I acknowledge that Angelica Capital Trust is not a party to the sales transaction, Angelica Capital Trust does have a vested interest in the closing occurring as planned in the next few weeks. Any newly initiated litigation could disrupt the capital required for the closing to occur.
>
> ***Let me be clear that if the planned closing does not occur, Addiction Recovery Care, LLC will be forced to seek debtor protection and/or reorganization.*** Such an action is not in the best interest of ARC, and is not in the best interest of Angelica Capital Trust. . . .

(Emphasis added.) Ms. Burke reiterated ARC's request that Angelica agree to some delay in payment.

44. Outside counsel for Angelica finally was able to speak to Ms. Burke on January 5, 2026. In that call, Ms. Burke said it was "not possible" for ARC to pay Angelica and that payment simply "was not going to happen" before any deal closed with ARC's supposed new buyer. Ms. Burke said that Angelica's money was still in ARC's bank account "at least as of yesterday" (*i.e.*, January 4, 2026) when Ms. Burke last had been informed, but added that there was "not a lot of money" in the account and that ARC had "operational expenses."

45. Ms. Burke said that she would provide Angelica with a copy of ARC's purported "binding" letter of intent with its supposed new buyer, and potentially other information including its bank balance, in an effort to stave off litigation. She did not send anything or communicate further, however. Outside counsel for Angelica followed up with an email to Ms. Burke later that day. Ms. Burke did not respond.

**VI.    Angelica Commences an Arbitration in New York, New York Against Respondents.**

46. At this point, it was clear that ARC was playing a shell game of some sort.

47. ARC plainly was desperate to get a buyer for its assets and entities in order to settle with the DOJ and resolve the intense pressure it was facing on that front. ARC had wanted to get cash for the Purchased Tax Receivables in the first place in order to enhance ARC's position in its dealings with

- 13 -

Ethema; apparently ARC believed it would be more attractive to Ethema if there was cash in ARC's bank account or if it was able to purchase some assets with that cash. Given that ARC's available cash in its bank account as of December 10, 2025 was only $99,716, ARC had apparently run through the millions of dollars Angelica had paid ARC for the Purchased Tax Receivables. When the Ethema deal fell through, ARC scrambled to get a new buyer and apparently wanted to use the $8,146,277.11 (the amount of the Purchased Tax Receivables) in its bank account to falsely convey some sense of financial health to its new potential buyer.

48. As ARC's in-house counsel, Ms. Burke had admitted ARC also had "operational expenses" and not much else in its bank account. ARC needed to continue to misappropriate Angelica's property to keep limping along to some sale event in the hope of convincing some buyer to close. The Ethema deal had already fallen through, and the timelines on ARC's deal with a supposed "new buyer" kept lengthening. And if the deal with that supposed "new buyer" did not come together, ARC would "be forced to seek debtor protection and/or reorganization" as Ms. Burke had threatened.

49. ARC had said it had no intention of handing over Angelica property unless it was able to close some transaction, and plainly there is substantial risk that ARC will use Angelica's money for its own purposes and declare bankruptcy if its last gasp efforts do not work out.

50. The Agreements have a broad arbitration clause. Specifically, Section 23 of the Agreements provides:

> The parties expressly acknowledge and agree that any dispute, claim or controversy arising out of or relating to this Contract or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this Contract to arbitrate, shall be resolved exclusively by final and binding arbitration conducted by the American Arbitration Association (AAA) in Manhattan, New York (the "**Designated Venue**") before one (1) arbitrator. By executing and delivering the Contract, Buyer and Seller each submit to the exclusive jurisdiction of the Designated Venue, including the *in personam* jurisdiction of the Designated Venue, waive any objection to such jurisdiction on the grounds of venue or forum non conveniens or the absence of *in personam* jurisdiction and any similar grounds. parties are unable to challenge or appeal such determination. The arbitration shall be administered by the AAA pursuant to its Commercial Arbitration Rules and in accordance with the entered in any court. The parties agree that time is of the essence with respect to any arbitration under this Contract and arbitration (i) hearings shall take place within 60 days of filing; and (ii) awards shall be rendered within one month of the final hearing. Any appeal in respect of an award must be filed through the AAA in accordance with its Appellate Arbitration Rules. This paragraph shall not preclude a party from seeking provisional remedies in aid of arbitration or equitable relief from a court in the Designated Venue.

51. On January 12, 2026, Angelica filed an arbitration with the American Arbitration Association against ARC and the Personal Guarantors (the "Arbitration"). In that pending Arbitration, Angelica seeks to recover from ARC: (i) the Purchased Tax Receivables, *i.e.*, $8,146,277.11 respecting the amounts ARC received from the IRS; (ii) contractual 18% default interest calculated annually from the date of ARC's payment default (*see* Agreements, Section 12.7); and (iii) ARC's costs of collection, including reasonable attorneys' fees. From the Personal Guarantors, Angelica seeks recovery of (i) contractual liquidated damages of 150% of the amount of the IRS Refund Checks, *i.e.*, a total of $12,219,415.67 ($8,146,277.11 x 150%); and (ii) Angelica's costs of collection, including reasonable attorneys' fees. Angelica's contractual rights to these amounts are clear and ARC has never disputed that it owes Angelica this money.

52. Although the Arbitration is expedited, it will take approximately three months to get an award, and some additional time to judicially confirm the award before Angelica can execute on a judgment. During that time, there is substantial risk that ARC will use Angelica's property (which it appears to be holding in its bank account at Community Trust Bank) for its own purposes, *e.g.*, to pay operational expenses and/or to transfer to some potential buyer (who may pay the DOJ settlement amounts directly). In the meantime, there also is substantial risk that ARC will declare bankruptcy if it is unable to convince some potential buyer to close a deal. Thus, by the time that Angelica has an enforceable judgment, ARC may have dissipated Angelica's property and Angelica will be unable to collect. Accordingly, absent injunctive relief from this Court, the Award may be rendered ineffectual and Angelica will suffer irreparable harm.

53. The balance of equities here overwhelmingly favors Angelica. ARC is holding Angelica's property and misappropriating it for its own use. ARC does not have even colorable legal basis for doing so. ARC clearly is in financial crisis — indeed, it has threatened bankruptcy — and there is substantial risk of ARC further misappropriating Angelica's property and dissipating Angelica's assets to try to stave off ARC's many other problems. To the extent it is trying to use Angelica's assets to close a transaction with a supposed new buyer, it seems likely that ARC's desperation to do so is motivated by a need to mislead them about ARC's financial health or continue operations by using Angelica's money.

54. Pursuant to Section 12.3.3 of the Agreements, ARC has waived the posting of any bond.

**WHEREFORE**, Petitioner respectfully requests that this Court:

1. Issue a temporary restraining order and injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure and N.Y. CPLR 7502(c) to prevent Respondents, during the pendency of the Arbitration and any confirmation and enforcement proceedings, from:

    (i) Transferring, causing to be transferred, or taking any action to transfer any funds out of ARC's bank account(s) at Community Trust Bank;

    (ii) Transferring, causing to be transferred, or taking any action to transfer any assets or entities owned by ARC or make any payments (whether from any bank account or otherwise) to any third party in any manner that would leave ARC with less than $10 million in liquid assets, such being a reasonable estimate of ARC's liability to Angelica including the Purchased Tax Receivables, contractual 18% default interest, and Angelica's costs of collection.

2. Issue an order pursuant to Section 12.6 of the Agreements awarding Angelica its expenses, attorneys' fees, and costs incurred in connection with this Petition.

3. Award the Petitioner such other and further relief as this Court deems just and proper.

Dated: January 12, 2026

CLIFFORD CHANCE US LLP

By: _____
Anthony M. Candido
Julia Krusen
Two Manhattan West
375 9th Avenue
New York, New York 10001
(212) 878-8000

*Attorneys for Petitioner*
*Angelica Capital Trust*